## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :　No. 22 Civ. _____ |
| | : |
| BRIJESH GOEL & AKSHAY NIRANJAN, | :　JURY TRIAL |
| | :　DEMANDED |
| Defendants. | : |
| | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendants Brijesh Goel ("Goel") and Akshay Niranjan ("Niranjan"), alleges as follows:

### PRELIMINARY STATEMENT

1.     From at least February 2017 through at least November 2017 (the "Relevant Period"), Defendants Goel and Niranjan engaged in an insider trading scheme that netted them approximately $291,735 in profits.

2.     Goel, who was employed at a large investment bank (the "Investment Bank"), regularly received material nonpublic information concerning corporate acquisition transactions in which the Investment Bank was involved.  Goel tipped Niranjan, a close friend and a foreign exchange trader at another large financial institution, using material nonpublic information concerning at least four of these impending acquisitions.  Niranjan then used the information to trade call options on the securities of the acquisition targets including Lumos Networks Corp., Patheon N.V., PharMerica Corporation, and Calgon Carbon Corporation.  Niranjan placed the trades using a personal brokerage account held in the name of his brother.  Following public

1

announcement of the acquisitions, Niranjan sold, exercised, or assigned the options contracts in the account.

3.      Niranjan and Goel divided the profits from their options trading.

4.      By knowingly or recklessly engaging in the conduct described in this Complaint, defendants Goel and Niranjan violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

5.      The Commission brings this action under Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1].  The Commission seeks permanent injunctions against the Defendants, to enjoin them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of profits from the unlawful insider trading set forth herein plus prejudgment interest thereon; civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331, and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  The Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

7.      Venue in this district is proper under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the acts, practices, transactions and courses of business

constituting the alleged securities law violation(s) occurred in substantial part within this district and the Defendants reside in this district.

## DEFENDANTS

8.      **Brijesh Goel**, age 37, is a resident of New York, New York and is employed as a principal at a publicly-traded global asset manager.  From April 2013 through June 2021, Goel was an employee of the Investment Bank.  Between August 2015 and June 2021, he was a member of the Investment Bank's financing group and its structured finance unit.

9.      **Akshay Niranjan**, age 33, is a resident of New York, New York and is employed as a director at a global corporate banking institution, where he works as a foreign exchange trader. From April 2013 through July 2018, Niranjan was employed by the same institution, first in the area of rates structuring and then in foreign exchange trading.

## RELEVANT ENTITIES

10.      **EQT AB ("EQT")** is a global investment company and asset manager.  As part of its investment operations, EQT sponsors and operates certain private equity funds, including the EQT Infrastructure Fund III.  The EQT Infrastructure III fund represents that it makes equity investments in high quality, mid-sized infrastructure companies.

11.      **Lumos Networks Corp. ("Lumos")**, a Delaware corporation with a principal place of business in Waynesboro, Virginia, is a fiber-based bandwidth infrastructure and service provider in the Mid-Atlantic region of the United States.  Until November 2017, Lumos' stock was registered with the Commission and traded on the NASDAQ Stock Market ("NASDAQ") under the trading symbol LMOS.  On February 20, 2017, Lumos announced that it entered into an agreement with EQT to be acquired at a price of $18 per share, representing an enterprise value of approximately $950 million.  EQT completed the acquisition, and Lumos delisted and deregistered

its stock, in November 2017.  Lumos is currently a portfolio company of the EQT Infrastructure III fund.  In 2019, EQT rebranded Lumos as Segra.

12.     **Thermo Fisher Scientific, Inc. ("Thermo Fisher")**, a Delaware corporation with a principal place of business in Waltham, Massachusetts, is a supplier of scientific research instruments, materials and services.  Its securities are registered with the Commission and trade on the New York Stock Exchange ("NYSE").  Its common stock trades under the symbol TMO.

13.     **Patheon N.V. ("Patheon")**, a Netherlands-incorporated company with a principal place of business in Amsterdam, The Netherlands, was a global provider of outsourced pharmaceutical development and manufacturing services.  Until August 2017, Patheon's stock was registered with the Commission and traded on the NYSE under the trading symbol PTHN.  On May 15, 2017, Thermo Fisher announced a tender offer to acquire all of the issued and outstanding shares of Patheon for $35 per share in cash, which represented a purchase price of $7.2 billion. Thermo Fisher completed the acquisition, and Patheon delisted and deregistered its stock, in August 2017.

14.     **KKR & Co., Inc. ("KKR")**, a Delaware corporation with a principal place of business in New York, New York, is a global investment firm that offers asset management services and insurance products.  KKR's securities are registered with the Commission and trade on the NYSE.  Its common stock trades under the symbol KKR.

15.     **Walgreens Boots Alliance, Inc. ("Walgreens Boots Alliance")**, a Delaware corporation with a principal place of business in Deerfield, Illinois, is a global provider of retail pharmacy services.  Its securities are registered with the Commission and trade on the NASDAQ. Its common stock trades under the symbol WBA.

16.    **PharMerica Corporation ("PharMerica")**, a Delaware corporation with a principal place of business in Louisville, Kentucky, is a privately-held institutional pharmacy services company.  Until December 2017, its stock was registered with the Commission and traded on the NYSE under the trading symbol PMC.  On August 2, 2017, PharMerica announced it would be acquired as part of a private joint venture sponsored by KKR and Walgreens Boots Alliance. Per the acquisition agreement, KKR and Walgreen Boots Alliance agreed to acquire PharMerica's stock for $29.25 per share in cash.  The acquisition was completed, and PharMerica delisted and deregistered its stock, in December 2017.

17.    **Kuraray Co., Ltd. ("Kuraray")**, a Japanese company with a principal place of business in Tokyo, Japan, is a manufacturer of chemicals, fibers and other materials.  Its securities are listed on the Tokyo Stock Exchange.

18.    **Calgon Carbon Corporation ("Calgon Carbon")**, a Delaware corporation and a manufacturer of filtration systems for gases and liquids, is a subsidiary of Kuraray.  Until March 2018, Calgon Carbon was an independent company, and its stock was registered with the Commission and traded on the NYSE under the trading symbol CCC.  On September 21, 2017, Calgon Carbon announced that it entered an agreement to be acquired by Kuraray for $21.50 per share in cash, representing an equity valuation of $1.1 billion.  Kuraray completed the acquisition, and Calgon Carbon delisted and deregistered its stock, in March 2018.

## FACTUAL ALLEGATIONS

19.    Goel and Niranjan met as graduate students at a business school located in northern California.  After graduation in 2013, they each moved to New York, New York.  In the years that followed, Goel and Niranjan became close friends, playing squash together at local racquet clubs, taking trips together overseas, and, at times, living in the same high-rise building.

20.     In early 2017, Niranjan and Goel began engaging in a scheme to use the information that Goel learned through his employment with the Investment Bank to engage in trading, and share the profits.  Goel regularly received material nonpublic information concerning corporate acquisition transactions in which the Investment Bank was involved.  Goel tipped Niranjan about this information, and Niranjan then used the information to trade call options.  Niranjan placed the trades using a personal brokerage account held in the name of his brother.  Following public announcement of the acquisitions, Niranjan sold, exercised, or assigned the options contracts in the account.  Niranjan and Goel divided the profits generated by this trading scheme.

21.     An option is, in substance, a contract that gives the option's owner the right to buy or sell shares of the underlying stock at a set price per share, known as the option's "strike price." Options to buy shares are known as "call" options.  Options to sell shares are known as "put" options.

22.     Goel and Niranjan's agreement to buy call options in target companies meant that they would always be wagering that the underlying stock would increase in value over time.  When a call option's underlying stock is trading at a price above the option's strike price, the option is considered to be "in the money" because the option owner can exercise the call option and buy the stock at the strike price and then sell the stock into the market for a profit.  When a call option's strike price is greater than the market price, the option is "out of the money" because the exercise of the option and sale of the stock into the market would result in a trading loss.

23.     Throughout the Relevant Period, Goel's work responsibilities gave him access to information about merger and acquisition deals in which the Investment Bank participated.

24.     Throughout the Relevant Period, Niranjan knew or was reckless in not knowing that Goel's position at the Investment Bank gave him access to information about these highly

confidential transactions and that Goel was prohibited from sharing material nonpublic information about any merger or acquisition transactions in which the Investment Bank was involved.

25.     Goel and Niranjan only shared material nonpublic information in person.

**A.     Goel's Receipt of Confidential MNPI at the Investment Bank**

26.     Prior to committing capital to finance pending or proposed corporate transactions, including mergers and acquisitions, deal teams at the Investment Bank obtain approval from certain firmwide committees, such as the Firmwide Capital Committee and the Firmwide Credit Markets Capital Committee.  As part of this approval process, deal teams circulate, using internal email distribution lists, confidential memoranda to the relevant committees, and Investment Bank personnel who support the committees.

27.     The circulated confidential memoranda typically include highly confidential and material nonpublic information about ongoing merger and acquisition transactions that have not been announced to the public.  The memoranda often describe, for example, the amount of a buyer/acquirer's bid, the target/seller's acceptance or an analysis of the likelihood of the target's acceptance of the bid, the status of negotiations, whether the parties are engaged in due diligence and the scope of that diligence, a deal valuation, and the expected timing of the transaction.

28.     The emails distributing these memoranda typically include a header, in bold and all caps, warning the recipients:  "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."

29.     The attached confidential memoranda typically have the same header stamped on each page.  The memoranda also typically include a warning footer ("Insider Trading Warning Footer") on the front page that cautions the reader:

Please be aware that, to the extent that this memorandum contains material non-public information, the use of this information is restricted by law (including, but not limited to, provisions of the U.S. securities laws) and the Firm's policies. Inappropriate use or disclosure of this information could have serious consequences for you and the firm, including potential criminal liability.

30.     During the Relevant Period, Goel was a member of the distribution lists for the Firmwide Capital Committee and the Firmwide Credit Markets Capital Committee and, through these lists, routinely received confidential memoranda circulated by deal teams seeking approval to use the Investment Bank's capital to finance then-nonpublic corporate transactions, including mergers and acquisitions.

**B.     Investment Bank's Protection of Confidential Information and Insider Trading Prohibition**

31.     The Investment Bank maintains internal policies protecting its confidential information related to the bank's clients, customers, and transactions. These policies were in effect during the Relevant Period.

32.     Under these policies, "[c]onfidential information may only be used for the specific purpose for which it was provided or developed."

33.     Investment Bank personnel who become aware of material, non-public information about an issuer or its securities are prohibited from (i) buying or selling the issuer's securities in personal, client or firm accounts; (ii) directing, soliciting, inducing, encouraging, or recommending the purchase or sale of those securities; and (iii) and disclosing such information to others.

34.     As an employee of the Investment Bank, Goel was required to follow these policies.

35.     Goel also received periodic compliance training from the Investment Bank. This training highlighted that "[a]ll client information is confidential and must not be disclosed outside of [the Investment Bank] without proper approval." The training materials described material

nonpublic information as "[i]nformation about a company, sovereign or other entity that is not publicly available and is reasonably expected to affect the price of a security and any related financial instruments (e.g., unannounced M&A and offering activity, unannounced earnings or financial projections)."  Further, with respect to insider trading, the training reminded Investment Bank personnel that the violation includes not only personal trading, but also "encouraging" or "tipping" others to trade, using material, nonpublic information.

  **C.** **Niranjan's Training Regarding MNPI and Insider Trading**

  36. Niranjan's employer similarly provided him with periodic training about the handling of material nonpublic information and the prohibition on using that information for private gain.

  37. This training defined "inside information" as "information of a precise nature, which has not been made public, relating, directly or indirectly, to one or more issuers or to one or more financial instruments, and which, if it were made public, would be likely to have a significant effect on the prices of those financial instruments or on the price of related derivative financial instruments."

  38. These materials further defined "insider dealing" as arising "where a person possesses inside information and uses that information by acquiring or disposing of, for his own account or for the account of a third party, either directly or indirectly, financial instruments to which that information relates."

  **D.** **Tip and Trading Based on Lumos Acquisition Information**

  39. On February 12, 2017, at approximately 6:00 p.m., Goel received an email from the Investment Bank's Firmwide Credit Markets Capital Committee distribution list advising of the bank's activities supporting EQT's acquisition of Lumos ("Lumos Acquisition").  The email

attached a confidential memorandum setting forth the deal team's business case for committing bank capital to support the transaction.

40.     The cover email included the bold, all caps header:  "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."

41.     The confidential memorandum attached to the email provided highly confidential and material nonpublic information concerning the Lumos Acquisition, including: the amount of EQT's bid, EQT's intention to sign and announce the transaction quickly, the financial structure of the proposed leveraged buyout, and the deal team's assessment that the resulting Lumos debt would be an attractive investment in the current loan market.

42.     Each page of the confidential memorandum included the bold, all caps header: "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."  The Insider Trading Warning Footer appeared on the memorandum's first page.

43.     In the afternoon of February 13, 2017, Goel contacted Niranjan and later that evening the two met.  During the meeting, Goel tipped Niranjan with material nonpublic information concerning the Lumos Acquisition.

44.     The next day, February 14, 2017, Niranjan purchased Lumos call options in his brother's brokerage account.

45.     Six days later, on February 20, 2017, while the markets were closed for the Presidents' Day holiday, Lumos publicly announced that it entered into a definitive agreement to be acquired by EQT at a price of $18 per share, representing an enterprise value of approximately $950 million.  The acquisition price represented an 18% premium to Lumos' closing stock price from the previous business day.

46.     The next day, February 21, 2017, Lumos' stock price increased on a trading volume of over 6 million shares and closed at $17.65 per share.

47.     As the stock price rose in response to public demand, the Lumos option contracts that Niranjan had purchased before the announcement likewise increased in value, creating a profit of approximately $600.

**E.     Tip and Trading Based on the Patheon Acquisition Information**

48.     On April 24, 2017, at approximately 6:03 p.m., Goel received an email from the Investment Bank's Firmwide Capital Committee distribution list advising of the bank's activities supporting Thermo Fisher's acquisition of Patheon ("Patheon Acquisition").   According to the email, the Investment Bank was acting as the "buyside adviser" to Thermo Fisher.  The bank's deal team was seeking committee approval to authorize an $8 billion bridge loan facility to support the transaction's financing.

49.     The cover email included the bold, all caps header:  "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."  A summary paragraph explained, "This transaction has not been publicly announced."

50.     The confidential memorandum attached to the email provided highly confidential and material nonpublic information concerning the Patheon Acquisition, including: the details of Thermo Fisher's initial bid, Patheon's response to the bid, Patheon's willingness to participate in the transaction, the current progression of due diligence activities, and an estimated valuation of the transaction.

51.     Each page of the confidential memorandum included the bold, all caps header: "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."  The Insider Trading Warning Footer appeared on the memorandum's first page.

52.     Later in the evening of April 24, 2017, Goel contacted Niranjan, and that night the two met.    During the meeting, Goel tipped Niranjan with material nonpublic information concerning the Patheon Acquisition.

53.     The next day, April 25, 2017, and again on May 3, 2017, Niranjan purchased Patheon call options in his brother's brokerage account.

54.     On May 15, 2017, Thermo Fisher and Patheon publicly announced that their boards of directors had approved Thermo Fisher's acquisition of Patheon.   The announcement notified the public that Thermo Fisher would commence a tender offer to acquire all of the issued and outstanding shares of Patheon for $35 per share in cash.

55.     The acquisition price represented a 35% premium to Patheon's closing stock price from the previous business day.

56.      On the date of the announcement, Patheon's stock price jumped on a trading volume of over 44 million shares and closed at $34.60 per share.

57.     As the stock price rose in response to public demand, the Patheon option contracts that Niranjan had purchased before the announcement likewise increased in value, creating a profit of approximately $40,900.

F.     **Tip and Trading Based on the PharMerica Acquisition Information**

58.     On May 8, 2017, at approximately 2:17 p.m., Goel received an email from the Investment Bank's Firmwide Capital Committee distribution list providing the Committee agenda for an upcoming meeting on May 10.   In the agenda attached to the email, the first transaction listed for review was the Investment Bank's committed financing to support KKR and Walgreens Boots Alliance's acquisition of PharMerica ("PharMerica Acquisition").   The email and agenda bore the bold, all caps header:   "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."

12

59.     On May 9, 2017, at approximately 4:18 p.m., Goel received an email from the same distribution list attaching a confidential memorandum setting forth the business case for the committee's approval to commit Investment Bank capital to support the PharMerica Acquisition. The cover email bore the bold, all caps header:  "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."

60.     The attached confidential memorandum provided highly confidential and material nonpublic information concerning the PharMerica Acquisition, including: the details of the purchase price, the acquirers' proposed financing to support the purchase, the current progression of due diligence activities, and an estimated timeline for financing activities through the transaction's closing, which was expected to occur by the end of June 2017.

61.     Each page of the confidential memorandum included the bold, all caps header: "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."  The Insider Trading Warning Footer appeared on the memorandum's first page.

62.     Later in the evening of May 9, 2017, Goel contacted Niranjan, and that night the two met.  During the meeting, Goel tipped Niranjan with material nonpublic information concerning the PharMerica Acquisition.

63.     Starting the next day, May 10, and continuing through June 26, 2017, Niranjan purchased PharMerica call options in his brother's brokerage account.  The call options, which cost a total of $14,868, expired out of the money in June and July 2017.

64.     On August 2, 2017, PharMerica publicly announced it had agreed to be acquired by KKR and Walgreens Boots Alliance in a buyout transaction in which PharMerica shareholders would receive $29.25 per share in cash.

65.     The acquisition price represented a 16.8% premium to PharMerica's closing stock price from the previous business day.

66.     On the date of the announcement, PharMerica's stock price rose on a trading volume of 8 million shares and closed at $28.95 per share.

67.     Although the stock price rose in response to public demand, the PharMerica option contracts that Niranjan had purchased before the announcement had expired out of the money in June and July 2017, yielding no profits.

**G.      Tip and Trading Based on the Calgon Carbon Acquisition Information**

68.     On September 1, 2017, at approximately 9:26 a.m., Goel received an Investment Bank Firmwide Capital Committee distribution list email advising him of the bank's activities supporting Kuraray's acquisition of Calgon Carbon ("Calgon Carbon Acquisition").   According to the email, the Investment Bank was the sole financial adviser to Kuraray, and the Investment Bank's deal team was seeking committee approval to authorize commitments for a $1.3 billion bridge loan to support Kuraray's acquisition financing.

69.     The cover email included the bold, all caps header:  "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."  A summary paragraph explained, "[t]his transaction has not been publicly announced."

70.     The confidential memorandum attached to the email provided highly confidential and material nonpublic information concerning the Calgon Carbon Acquisition, including:  the purchase price of $1.1 billion, the fact that the buyer and seller had reached a non-binding agreement on price and were in a confirmatory due diligence stage, the anticipated timing of a signed merger agreement, the perceived willingness and engagement of the target board of directors to accept Kuraray's purchase offer, and the parties' ongoing activities to accelerate completion of a merger agreement.

71.     Each page of the confidential memorandum included the bold, all caps header: "FOR INTERNAL USE ONLY – DO NOT FORWARD EXTERNALLY."  The Insider Trading Warning Footer appeared on the memorandum's first page.

72.     Later in the morning of September 1, 2017, Goel contacted Niranjan and later that day, the two met.  During the meeting, Goel tipped Niranjan with material nonpublic information concerning the Calgon Carbon Acquisition.

73.     On September 6, September 11, and September 19, 2017, Niranjan purchased Calgon Carbon call options in his brother's brokerage account.

74.     On September 21, 2017, prior to market open, Kuraray publicly announced that it would acquire all of Calgon Carbon's shares for $21.50 per share in cash.

75.     The acquisition price represented a premium of over 62% to Calgon Carbon's closing stock price from the previous business day.

76.     On the date of the announcement, Calgon Carbon's stock price spiked on a trading volume of over 24 million shares and closed at $21.40 per share.

77.     As the stock price rose in response to public demand, the Calgon Carbon call options in Niranjan's brother's account likewise increased in value, creating a profit of approximately $250,235.

**H.     Niranjan's Relocation and Sharing of Illicit Trading Profits**

78.     In June 2018, Niranjan moved from New York to London and began a new job at a proprietary trading firm based in the United Kingdom.

79.     Approximately three years later, in August 2021, Goel and Niranjan exchanged written communications describing a loan that Niranjan was purportedly going to make to Goel. There was no loan, and in fact, the payment represented profits from the trading scheme.

80.     On September 30, 2021, Niranjan sent $85,000 to Goel by wire transfer, which represented proceeds from the trading scheme.

**CLAIM FOR RELIEF**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

81.     The Commission repeats and incorporates by reference the allegations in Paragraphs 1 through 80 above.

82.     Goel learned material nonpublic information through his work as an employee of the Investment Bank.  Goel knew or was reckless in not knowing that the information he possessed concerning the Lumos Acquisition, the Patheon Acquisition, the PharMerica Acquisition, and the Calgon Carbon Acquisition (collectively, the "Acquisitions") was material nonpublic information.

83.     At all relevant times, Goel owed the Investment Bank a duty of confidentiality that required him to keep nonpublic information concerning the Acquisitions confidential.  Goel knew or was reckless in not knowing that he owed the Investment Bank a duty of confidence to keep the material nonpublic information he possessed concerning the Acquisitions confidential.  Goel breached that duty by tipping Niranjan about the Acquisitions with the knowledge that Niranjan would use this information to trade.  Goel tipped Niranjan to obtain the benefit of making a gift of information to a friend and with the expectation that Niranjan would share a portion of the insider trading profits, which he later did by making an $85,000 wire transfer to Goel.

84.     Niranjan knew or was reckless in not knowing that Goel provided him the material nonpublic information in violation of a duty of confidentiality.

85.     At the time he traded in the securities of Lumos, Patheon, PharMerica, and Calgon Carbon, Niranjan knew or was reckless in not knowing that he was in possession of information that was both material and nonpublic.

16

86.    By engaging in the conduct described above, Defendants Goel and Niranjan, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or of a national securities exchange:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon certain persons.

87.    As a result, Defendants Goel and Niranjan violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.    Enter a permanent injunction restraining Defendants Goel and Niranjan and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5];

B.    Require Defendants Goel and Niranjan to disgorge their ill-gotten gains, plus pre-judgment interest;

C.      Order Defendants Goel and Niranjan to pay civil monetary penalties pursuant to

Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

D.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

E.      Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

Joseph G. Sansone
Amy Harman Burkart
Michele T. Perillo*
Andrew J. Palid*
Richard M. Harper II*
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-4540 (Palid)
(617) 573-8979 (Harper)
(617) 573-4590 (Facsimile)
PalidA@sec.gov
HarperR@sec.gov

Dated:  July 25, 2022